OVERTON, Justice.
The Citizens of Florida appeal the Florida Public Service Commission’s orders 20162 and 20503, which established, among other things, an experimental profit-sharing plan with ratepayers for Southern Bell Telephone and Telegraph Company. The Citizens’ primary claim is that the Commission failed to take into account the factor of stimulation in adopting the rate plan for Southern Bell. We have jurisdiction, article V, section 3(b)(2), Florida Constitution, and we find that the Commission had substantial, competent evidence to justify its adoption of the rate plan.
The relevant facts indicate that Southern Bell filed a petition seeking, among other things, to decrease the rates on a variety of toll services over a period of three years, and to receive permission to retain one-half of its earnings exceeding the threshold return on equity of 15%. Southern Bell’s proposed plan contained new features not ordinarily contained in rate-making orders and tariffs. The Commission explained this new rate-setting plan in Order No. 20162 as follows:
Traditional utility regulation has historically taken the form of rate of return regulation (ROR) by independent regulatory authorities such as this Commission. Under this approach, privately-owned utilities such as Southern Bell are given the opportunity to collect rates which will cover operating costs and earn a reasonable rate of return on property devoted to providing the regulated service. In recent years in Florida, the Commission has calculated a rate of return as a midpoint and generally allowed a 100 basis point zone of reasonableness around that point. Southern Bell’s current authorized zone is 14-16%. The Southern Bell petitions are premised upon the idea that this traditional manner of regulation needs to be altered in the light of technological developments and governmental actions, particularly the 1984 Bell System divestiture. In Southern Bell’s view, alteration of the regulatory scheme would alleviate economic disincentives inherent in rate of return regulation.
Two major disincentives of ROR regulation discussed at the hearings were the incentive to overinvest and the lack of incentive to innovate, reduce cost and introduce new services. As to overin-vestment, the theory is that, because the return is tied to rate base, there is an incentive to increase the rate base in order to increase earnings. In other words, regulated firms have reasons to “goldplate” their physical plants. The theory behind the reduced innovation is that no reason exists to reduce costs and improve productivity when these gains are returned to the utility’s ratepayers.
To alleviate the perceived disincentives of ROR regulation, Southern Bell proposed a “rate of return sharing incentive plan.” This plan assumed the existing 14-16% range for return on equity. Under the proposal, earnings above 15% would be split 50/50 between the company and its ratepayers. Southern Bell would retain 50% of the amount over 15% and the Commission could allocate the remaining 50% as it saw fit, including possible refunds and rate reductions. Although it was not clear from the petitions, Southern Bell did agree .,that its earnings after sharing would not exceed 16% under its plan.
The Commission gave its general approval to the sharing concept but changed both the starting point for the sharing and the sharing percentage. Southern Bell had asked for the right to earn 15% before it was required to share its earnings with the ratepayers; however, the Commission required Southern Bell to share its earnings exceeding 14%. Further, rather than the fifty-fifty earning split proposed by Southern Bell, the Commission approved a sixty-forty split in favor of the ratepayers. The Commission created the following four-tier *1111 rate structure concerning Southern Bell’s earnings: authorized floor — 11.5%; rate-setting point — 13.2%; sharing begins — 14%; authorized ceiling after sharing — 16%.
We recognize that this order, which the Commission implemented for the short period of time between January 1, 1988, and December 31, 1990, was essentially experimental in nature. The new concept required more reporting than is customary. The Commission stated that, at the end of the period, it would be “better able to examine the merits of the [incentives] contained in the order.” It also retained the authority to terminate the experiment at any time.
Public counsel claims that the order should be vacated because it fails to take into account the principle of stimulation, which is based on the theory that “a price reduction leads customers to purchase more of a service.” Public counsel contends that the evidence demonstrated that a price reduction for toll services would lead to increased purchases and argues that the Commission cannot point to any evidence that supports its finding of zero stimulation.
Only one witness presented the primary evidence concerning stimulation. He explained the difficulty in trying to estimate stimulation within Florida. Further, he stated that Southern Bell had no experience with these kinds of plans. In response to a question from a Commission member, he stated, “You can be assured that any stimulation estimate is going to be wrong.”
In responding to public counsel’s motion for reconsideration, the Commission explained in Order No. 20503 how it weighed and applied the stimulation evidence in this plan:
Public Counsel argues that the reduction in access charges, message toll service (MTS) and WATS/800 Service will result in stimulation, or increased use of the services due to the lower prices. Public Counsel further posits that the increased usage makes the revenue reduction estimates stated in Order No. 20162 lower than they • actually will be due to the absence of stimulation factored into those estimates. There was some evidence that some stimulation could occur were the various rates to be lowered. The existence of this evidence does not automatically mandate Commission acceptance of the evidence as the Public Counsel suggests. It is this Commission’s prerogative to weigh the evidence that is presented. We remain unpersuaded that the stimulation levels indicated will occur with any degree of reliability. Our past experience with including stimulation in access charge reductions indicates that even Southern Bell cannot determine with any reliability the degree of stimulation that will occur. See Order No. 19677, Section IV, Paragraph C. pp. 20, 21. The access charge reduction and attendant MTS and WATS/800 reductions are a part of the total picture in this docket. We were aware of the stimulation argument in adopting the overall plan. We deliberately tilted the plan in favor of ratepayers to account for the prospective nature of the reductions in such ways as the 60/4.0 split in the ratepayers’ favor. This would tend to offset any stimulation revenues that may or may not come to pass. The myriad of factors that can affect the stimulation such as overall economic conditions and rate of growth add to the uncertainty surrounding the stimulation. In the present case, if stimulation occurs and as a result, Southern Bell’s earnings rise above 14% return on equity, customers will receive 60% of the benefit between 14%-16% and all benefits over 16%. Acceptance of Public Counsel’s argument would factor in the stimulation and provide customers with all of the predicted benefits before they take place. The approach used in Order No. 20162 is more appropriate on these facts and the Motion for Reconsideration on this point is hereby denied.
(Emphasis added.) As explained in its order, the Commission considered stimulation in changing the percentage split to favor the ratepayers.
We find that competent, substantial evidence exists to support the Commission’s *1112 order setting forth this plan and its determination that the principle of stimulation was unreliable in this case. Accordingly, we approve the Commission’s order in this cause.
It is so ordered.
EHRLICH, C.J., and McDONALD, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.